## COOPER *vs.* STONE.

A publication commenting upon a printed work is *libellious* which imputes to the author a dis-
regard of justice and propriety as a man, represents him as infatuated with vanity, mad with
passion, and the apologist from force of sympathy of another stigmatized with ingratitude
and perfidy; and which also charges him with publishing as true, statements and evidence
falsified, and encomiums retracted. So HELD on *demurrer* to a declaration, the court ruling
that the defendant could not on demurrer claim his communication to be *privileged* as a le-
gitimate criticism; the question of privilege solely appertaining to a *jury.*

DEMURRER to declaration for libel. The declaration states that the plain-
tiff is the author of numerous books, and among the rest of a certain book
called " Home as Found," and of a certain other book called " The History
of the Navy of the United States of America," both of which, before the
committing of the grievances by the defendant hereinafter mentioned, were
printed and published ; and which last mentioned book contains among other
things a true, honest and impartial narrative of the principal occurrences of
the engagement between the British and American squadrons on Lake
Erie during the last war between the United States and Great Britain, in
which engagement *Oliver H. Perry,* then an officer in the navy of the Uni-
ted States, commanded the American squadron, and *Jesse D. Elliott,* then
and now an officer in the navy of the United States, command-
ed one of the vessels of the American squadron called the \*Ni- [ \*435 ]
agara ;" yet that the defendant well knowing the premises, but
contriving and maliciously intending to injure the plaintiff in his good name,
fame and credit, and to bring him into general contempt, disgrace and infa-
my, and to cause it to be suspected and believed that the plaintiff had inten-
tionally and from unworthy and base motives, falsified and misrepresented
historical facts in the narrative of the engagement between the British and
American squadrons on Lake Erie, contained in the history of the navy, &c.
on the 8th June, 1839, at, &c. falsely, wickedly and maliciously published,
in a newspaper called the " New-York Commercial Advertiser," of which he
is the editor, a false, malicious and defamatory libel, of and concerning the
plaintiff, and of and concerning the history of the navy of the United States
of America, and the narrative therein contained of the engagement between
the British and American squadrons on Lake Erie. The plaintiff then set
forth with proper innuendoes the following libel : " Cooper's Naval History.
Although the same courtesy has not been extended to us in regard to this
book by its publishers which we uniformly experienced from them on similar
occasions, before we committed any criticisms upon Mr. Cooper or his works,
and what we have since continued to experience with respect to the works
published by them of other authors—yet we felt so much interest in the
subject as to induce us, notwithstanding this neglect, which as we do not

impute it to the worthy booksellers, is upon the whole rather flattering—to obtain this last work of Mr. Cooper's in spite of his prohibition, and to give it early, deliberate and candid perusal. Little as we owe to the author on the score of personal consideration, and great as had been our disappointment from many of his late publications, the expression of which had, as we found, provoked his resentment, we still cherished the hope that with the elevated theme he had now chosen, he would rise above the personal feelings and political prejudices that disfigure those of his preceding works to which we have alluded. We had hoped that on this occasion Mr. Cooper—to use a sea phrase as he does, in a sense that a seaman never used it in [ *436 ] —would " go aloft" instead of remaining *in the cockpit. We even believed it possible, that finding the subject congenial with his early tastes and pursuits, he would, if not animated by it to the noblest efforts, at least avoid the rocks and quicksands, which had already well nigh made shipwreck of his reputation as a writer, and regain a footing upon that strand, whence he first launched his gallant little bark upon a sea which, to young and rash adventurers, especially if they belong by nature as well as by profession to the *irritable genus,* is apt to prove a " sea of troubles." We must confess, however, that we were not without some misgivings. We had heard it rumored that the Naval History of the United States was to contain, if not a vindication of the conduct of Captain Elliott in the action on Lake Erie, at all events a much more favorable view of it than had been presented to the public by his commanding officer, the late Commodore Perry. But with all our experience of the waywardness, inconsistency and love of paradox which had distinguished the author of " Home as Found," we could hardly persuade ourselves that he had become so utterly regardless of justice and propriety as a man, so callous to the perceptions of good taste as a writer, so insensible to his obligations and responsibility as a historian, and so reckless of his character as a public candidate for literary distinction and immortal fame, as to forego and disregard the opportunity of retrieving in some degree the reputation and standing which he must have been conscious of having lost. We were certainly not prepared to find that the infatuation of vanity or the madness of passion could lead him to pervert such an opportunity to the low and paltry purpose of bolstering up the character of a political partizan, an official sycophant, and to degrade the name and object of history in a work claiming by its title to be national in its design, by salving the wounded reputation of an individual who, from the time of the transaction referred to by his apologist, has been regarded as one doing at best but doubtful credit to his profession—and who owes his continuance in the service, after the events of that day, solely to the forbearance and magnanimity of his superior, which he subsequently requited with ingratitude [ *437 ] and *perfidy. We have indeed been disappointed, however faint

were our hopes ; and we acknowledge that we were deceived in our estimation of the discretion, taste, judgment, tact and sensibility of Mr. Cooper, however doubtful we had felt as to his possession of any one of these qualities. But we must console ourselves with the reflection, that the power of sympathy is sometimes irresistible. Not content with leaving the character and conduct of Captain Elliott where his gallant commander was content to leave them—to be judged by the official report of the engagement, in which most assuredly he distinguished himself—his advocate, by travelling beyond that record and ascribing to him at least an equal meed of glory with that which as a historian he assigns to Captain Perry, has but repeated the insane attempt which his hero had before resorted to—of provoking an enquiry. But the patron is worthy of his client. Neither of them, it seems, was satisfied to let the cause rest upon the documentary evidence ; and both of them, we suspect, will live to repent their indiscretion. We had supposed that such had long been the case with the latter, but the zeal of his apologist affords evidence of a relapse. Can either of them have forgotten the exposure extorted some eighteen years ago from Com. Perry and his friends ? As to Captain Elliott, anxiously as he may have desired it, he must have found it impossible. But perhaps both he and his defender have imagined that the memory of the public was not so tenacious. The latter cannot be allowed to plead ignorance, as all the documents relative to the subject are to be found on the files of the Navy Department, to which he had access. The conduct, therefore, both of the author and of the actor on this occasion, can be accounted for only on the supposition that *quem Deus vult perdere prius dementat ;* and our readers will be better enabled to decide upon the justice of applying to them this familiar adage, by the extracts which we shall hereafter give from some of these documents."

The declaration contains a second count, setting forth another publication in the New-York Commercial Advertiser, which appeared on the 19th June, 1839, in these words : " But Mr. Cooper, who has long been regarded as his own worst enemy, has on this occasion proved him-  [ *438 ] self the worst enemy also of his friend. After the lapse of eighteen years he has thought proper to revive the memory of events which for the reputation and interest of that friend should have been buried in oblivion—and after a whole generation nearly has passed away, and many of the witnesses of the transaction had gone with it, he has deliberately penned an account of it, intended for posterity, from the statements of Captain Elliott and the evidence of his witnesses, and quoted in their support the official encomium of Com. Perry, without affording the least hint or intimation to the readers of his history that the former had been falsified, and the latter retracted. Unfortunately for his purpose, but most providentially for the fame of one of the most able and gallant of our naval heroes, he was provoked in

his lifetime to perpetuate the testimony which we have now adduced, to vindicate his conduct—not from the'aspersions of a malignant rival, for his envenomed shafts had fallen harmless from the panoply of truth and honor in which the character·he· assailed was armed—but from the partial and deceptive representations, and the gratuitous and insidious defence of one who has assumed the office and responsibility of a historian, and hopes that his work may be appealed to as an authentic record, by future·generations and to the latest age. It shall not be our fault if the bane be not accompanied by the antidote." The declaration then concludes in the usual form.

The defendant put in a separate demurrer to each count of the declaration, and the plaintiff joined in demurrer. The cause was argued by

*R. Cooper*, counsel for the plaintiff, and by the plaintiff *J. Fenimore Cooper* in pro. per.

*C. P. Kirkland & M. J. Bidwell*, for the defendant.

*By the Court*, COWEN, J. The matter as set forth in either count is denied by the defendant to be libellous. It is alleged to be 'false [ \*439 ]   and malicious, and to have been published \*by him with intent to injure the plaintiff and bring him into general contempt, disgrace and ignominy. These allegations are admitted by the demurrer; and the question is whether the matter necessarily had the tendency imputed to it by the pleader. The declaration recites that the plaintiff was the author, among other and previous books, of *the history of the navy of the United States*, the latter containing a true and impartial narrative of the battle of Lake Erie ; and avers that the libels were published of and concerning this part of the history, and of and concerning the plaintiff. One object of both is obvious. It was to impeach the truth of the narrative as being less favorable to Commodore Perry than his conduct on that occasion called for ; and more so to Capt. Elliot, who was a subordinate officer engaged in the same battle.·

The libel in the first count, speaking in reference to the general subject of the history, and especially the favorable point of view in which it places the conduct of Capt. Elliot, alludes to·a hope entertained by the defendant, that the plaintiff would, in his history, have risen above the personal feelings and political prejudices by which his preceding works had been disfigured. It speaks of·a rumor that the history was to contain a more favorable view of Capt. Elliot's conduct, than had been given by Com. Perry at the time ; but the defendant could hardly persuade himself that the plaintiff had become so utterly regardless of justice and propriety as a man, so insensible to his obligations and responsibility as a historian, &c. as to forego the chance of retrieving the reputation he must have been conscious of having lost. The

defendant was not prepared to find that the infatuation of vanity or the madness of passion could lead the plaintiff to pervert such an opportunity to the low and paltry purpose of bolstering up the character of a political partizan, an official sychophant; and to degrade the name and object of history, by salving the wounded reputation of one who had been regarded as of doubtful credit in his profession; one who, after the events of the battle, owed his continuance in the service to the forbearance of Com.

Perry, which he requited with ingratitude *and perfidy. The    [ *440 ] defendant then says he had indeed been disappointed ; but must be consoled that the power of sympathy is sometimes irresistible. The patron is worthy of his client. Perhaps both Capt. Elliot and his defender had underrated the memory of the public. The plaintiff could not be allowed to plead ignorance as all the documents relative to the subject were to be found on the files of the navy department, to which he had access.

We are thus presented with a series of remarks distinctly imputing to the plaintiff a disregard of justice and propriety, an insensibility to his obligations as a historian, the infatuation of vanity, the madness of passion, and low and paltry purposes. They present him as holding an affinity, and standing on a level with, and vindicating and bolstering up the character of an official sychophant, an officer unworthy of his place, a man guilty of ingratitude and perfidy. With such a man the sympathy of the plaintiff is represented to be irresistible, the patron as worthy of his client; and finally, the plaintiff is accused more directly, of palming falsehood upon the world in the name of history.

The slander is somewhat diluted, by being mixed up with a small portion of what may perhaps be legitimate commentary on that branch of the history in which it professes to have found aliment for its grossness. The defamatory matter is, however, easy of extraction, and, when concentrated, fully answers to the definition of a libel upon a private person. This definition may be found in any book which treats of the subject. It means a contumelious or reproachful publication against a person ; any malicious publication, tending to blacken his reputation, or expose him to public hatred, contempt or ridicule. *Vide* 2 *Pick.* 115, *per Lincoln, J.*

In the second count the defendant represents the plaintiff as deliberately penning an untrue account of the battle, intended for posterity, and derived from evidence which had been falsified or retracted, without the least hint or intimation of the latter. The defendant speaks of its being unfortunate for the plaintiff's purpose that Commodore Perry had himself disclosed the truth ; and declares that the *defendant adduced the    [ *441 ] statements of Commodore Perry to vindicate him from the partial and deceptive representations, and the gratuitous and insidious defence in-stituted by the plaintiff, who had assumed the office and responsibility of a

historian. The libellous matter set forth in this count is less extended and less loaded with epithets than the first. It is, however, sufficiently obvious. It charges the plaintiff with falsehood, an imputation which, when published in a written or printed form, has been holden libellous ever since *Austin* v. *Culpeper* was decided, in 35 *Car.* 2, *Skin.* 123. The case of *King* v. *Lake*, is there mentioned wherein it was adjudged that, to say of a man in a petition printed and published, that he is an unjust man, is slanderous, and an action lies ; and the judgment in that case was affirmed on a writ of error. *Skin.* 124. By way of illustration, the court remarked, that merely *to say* of a man he is dishonest, is not actionable, yet to *publish* so, or *put it upon the posts* is actionable. *Id.*

Assuming the articles to be libellous in themselves, the only answer given on the argument was, that the plaintiff appearing by the declaration to be an *author* and the defendant an *editor*, and the libel treating of the plaintiff as an author, it is thus on the face of the declaration shown to be a publication absolutely privileged. To maintain this position, *Carr* v. *Hood*, 1 *Campb.* 354, *note*, was relied upon. That case was tried at *nisi prius*. The plaintiff complained that he had been personally slandered, under the pretence of reviewing his works ; and it was put to the jury that if the criticism were fair and just, and reflected upon the plaintiff's character no farther than it was truly presented by his works, the defendant was justifiable even though he had ridiculed the plaintiff. It is unnecessary to pronounce whether that case may not have gone too far, because no one will pretend that the privilege of the press can warrantably be perverted to the purposes of wilfully and falsely assailing the character of any man. To say that he is an author, editor, or reviewer, is but saying that he is engaged in a profession which has been and may be made eminently useful to mankind, and which would

[ *442 ]   therefore *seem to call for peculiar protection and encouragement.

That the law should allow his productions to be criticised with great freedom, is not denied. If he has made himself ridiculous by his writings, he may be ridiculed ; if they show him to be vicious, his reviewer may say so. But the latter has no right, therefore, to violate the truth in either respect. The difficulty of sustaining this demurrer lies in its admitting that the plaintiff's moral character has been falsely and maliciously assailed by the defendant. This being imputed in the declaration, it behoved him to show that what he said was true, or at least that it was no more than a fair-deduction from the plaintiff's works. The question is one of good faith. It is always so in case of the highest and most absolutely privileged communications. The claim of privilege can therefore be settled only by a *jury*. I do not speak of criticism upon the works of an author in the abstract ; for this I admit no action can lie. Certainly not, unless the criticism be grossly false and work a special damage to the proprietor of the book at

which the strictures are levelled. The book cannot be plaintiff. I speak of attacks on the moral character of the author ; and I will not stop to weigh the argument which would disfranchise him, because he happens to be an author.

This is, I believe, the first attempt to try the question of privilege by a demurrer to the declaration. Something was said on the argument, of the declaration failing to point and apply the imputed slander by proper explanations. This is never necessary where the words are plain in themselves. It is difficult to read the articles as set forth in the counts without seeing at once that they are direct and undisguised attacks upon the moral character of the plaintiff by name.

Judgment for plaintiff on demurrer, leave, &c.