By the Court.
Bosworth, J.
—(Plaintiff’s Point IV.) An exception was taken to the decision of Ch. J. Oakley, declining to direct the cause to be tried before some other Judge of the Court. There had been a previous trial of it before the Chief Justice ; a new trial had been granted by this Court at General Term, and when this motion was made, the cause had been again reached, and called in its order on the calendar. The case states that this decision was made, after the Chief Justice had consulted with his brethren, in relation to the question raised by such motion.
We know of no recognized principle which will justify a Judge holding a Circuit Court, to direct a cause on the calendar, when reached and ready to be tried, to be postponed and wait its opportunity to be tried before another Judge, merely because it had been previously tried before himself. The considerations of inconvenience and delay, resulting from such a practice in the Circuit Courts as they are generally constituted, would not, it is *232 true, exist to the same extent, with reference to a court organized as this court is. But that view cannot affect the legal rights of the parties, nor the legal duty of the presiding Judge. The objection by either party to retrying a cause before a Judge before whom it had been once tried, would apply with nearly, if not quite as much force to trying it before either of the Judges who sat at General Term, and heard the argument which resulted in granting a new trial. For it is to be presumed that they thoroughly examined the evidence, and formed opinions as to the merits according to such evidence, especially in a case where, as in this one, a new trial was sought as well on the ground of excessive damages as for erroneous decisions of questions of law. Even if such a presumption should not entirely and in all respects accord with the fact, yet it would be true that the Judge who examined and scrutinized the evidence most closely, and made himself most familiar with its details, would be most obnoxious to such an objection, because the inference would be just, that he had more decided views with respect to the whole merits as developed by the evidence given on the first trial, than one who had given less attention to the evidence in all its particulars.
It is no part of 'the province of a Judge to find the facts, and there is no reason to suppose that on a second trial he will not apply any rules of law determined by the court which granted a new trial, with as much firmness and accuracy as if he was a stranger to the cause. Any judge would willingly be relieved from trying a cause, which he knew either party was averse to trying before him. But although he might be disposed to gratify any such prejudice of either party, he is not at liberty to refuse to try a cause, when reached and ready to be tried, for any reason which the law does not recognize as sufficient. The ground of objection assigned will not warrant us in granting a new trial either because it was erroneous to overrule it, or because in the proper exercise of judicial discretion it should have been sustained.
(Y. a.) The decision that the defendant had not a right to open the cause to the jury was not erroneous. The action being one to recover damages for a tort, and one in which punitory damages might be given on proof of facts authorizing *233 it; the orderly course of proceeding made it proper that the plaintiff, before resting, should not only establish an apparent right to recover some damages, but should give all the evidence on which he relied to affect the amount of the recovery.
As to the privileged matter forming a part of the alleged libels, it was essential to a right to recover to prove malice or bad faith in publishing it. As to snch matter, the burden of proof was on the plaintiff, and he was obliged to prove the affirmative of the issue.
(IV. a.) The Judge at the trial decided that the complaint and the amended answer to it, served on the 13th of May, 1852, constituted the only pleadings in the action, on which it was to be determined what were the issues to be tried, and that the reply served on the 13th of January, 1852, and the amended reply served the 23d of April, 1852, did not form any part of such pleadings : to this decision the defendant excepted.
After those two replies had been interposed, the defendant was allowed to amend his answer, and he served an amended answer on the 13th of May, 1852. At .that time chap. 392 of the Laws of 1852 was in force. That chapter abolished a reply, except to an answer setting up new matter constituting a counterclaim. (Laws of 1852, pp. 651, 654, 655, §§ 153, 168.)
The two replies ceased to be pleadings in the action on and after service of the amended answer, in the sense that they then formed no part of the pleadings by which the issues to be tried were formed. Those issues arose upon the complaint and the amended answer of the 13th of May, 1852, and upon them alone. Neither reply was offered by the defendant as evidence,' against the plaintiff, of any fact stated in it.
(V.) An exception was taken by the defendant, to a decision allowing the plaintiff to read from a number of the Herald issued on the 15th of December, 1851, so much of an article in it, as related to the circulation of that paper, at the time of the alleged libel. The grounds of exception were, that the matter was not shown to be relevant, and that such testimony could only be given to prove special damages, and no special damages were alleged; and that the “ circulation of the Herald was stated in the complaint to be so much, and that fact not being denied was admitted.”
*234 The extent of the circulation of the alleged libels was relevant and competent, even though no special damages had been alleged. The extent of the circulation was a constituent part of the wrong done to the plaintiff, if the publication itself was wrongful.
The complaint states that the Herald was a paper “ of large circulation, and boasting of a circulation of 20,000 copies daily.”
This does not state the extent of the circulation, and there is nothing in the terms of this averment, which made it erroneous to admit proof of its exact circulation.
(Point VII.) The testimony of Strakosch was offered to show express malice, and was objected to by the defendant “ on the ground that it was incompetent and irrelevant.” It was allowed to be read, and the defendant excepted to the decision.. This court has decided in this action, that evidence to prove that fact was admissible. The reasons in support of that decision are stated at length in Fry v. Bennett (4 Duer, 247), and need not be here repeated.
That decision also disposes of the defendant’s sixth point made on this appeal, viz.: That “ it was not competent to the plaintiff to prove express malice, unless he admitted that the alleged libels were, prima facie, privileged.”
Such portions of the libelous matter as are, pn-ima facie, privileged, called for such evidence, or evidence showing they were ' published in bad faith, to entitle the plaintiff to recover damages for the publication of them.
As to all such portions as are of themselves actionable, proof of actual malice in publishing them was admissible, if the points ruled in Fry v. Bennett (as reported in 4 Duer, 247), were correctly decided.
(Point VIII.) When the plaintiff rested, the defendant moved to dismiss the.complaint on the ground, among others, that each of the libels was of the plaintiff as the manager of a theatre in the city of New York; that opening such theatre without a license was unlawful, and that it was necessary to allege in the complaint the fact of the grant of such a license, and even had that fact been alleged it was unproved, and the plaintiff could not maintain an action for a libel of him, in such illegal capacity.
The motion was, denied, and the defendant excepted.
*235 In a subsequent stage of the cause, the plaintiff gave in evidence a license, dated the 20th of November, 1848,’ by the then mayor of New York, authorizing “D. P. Fry” to open and keep open the Astor Place Opera House, for theatrical performances, for “three months, commencing from the 1st day of November, 1848, and ending on the 1st day of February, 1849.” “This evidence was objected to, as incompetent and irrelevant,” and the decision admitting it was excepted to by the defendant.
The defendant requested the Judge to charge that the plaintiff could not recover for a libel of him as a manager of a theatre, without alleging and proving a license to open and continue it. Also that the license offered in evidence did not authorize the plaintiff to exhibit operas, and, therefore, he could not recover for any of the alleged'libels upon him.
Nor for any of those published prior to the 20th of November, 1848.
Nor for those published after the 1st of February, 1849.
If the “ operas ” of which the plaintiff was manager were not “theatrical performances” within the meaning of those words, as used in, “ An act to amend ‘ an act to create a fund in aid of the Society for the Reformation of Juvenile Delinquents in the city of New York, and for other purposes,’ passed February 1, 1839,” then that act does not reach them, and there is no law interfering with the right of any person to provide such amusements, although not licensed. (Session Laws of 1839, p. 11, chap. 13.)
The act thus amended declared that every person offending against the provision requiring a license should be guilty of a misdemeanor, and be subject to a fine of $100 for each day, or imprisonment not exceeding three months. (Laws of 1829, chap. 302, p. 436, § 4.) But that section was repealed by the act of the 1st of February, 1839. The latter act does not, in terms, declare that such exhibitions, without a license, are unlawful. The original act made the giving of them without a license indictable. By so amending the original act, in 1839, that a person giving such exhibitions without a license could not be indicted, the legislature seem to have regarded such acts as not, in themselves, immoral or opposed to public policy, but as a business or pursuit which might not improperly be taxed in aid *236 of the reformation of juvenile delinquents in the city in which such business was prosecuted.
Though unlicensed, no indictment will lie under 2 R. S., 696, § 45. The provisions of the act of February 1, 1839, are peculiar. That act requires the proprietor or manager to “annually obtain” a license. For not taking “out such license,” “ or consenting to or allowing such performances without first taking out the same,” every manager or proprietor shall be subject to a penalty of $500, “for every such neglect or omission.” (§ 1.)
Section one does not declare how much must be paid or may be charged for an annual license. Section two authorizes a license to be granted for a term less than a year, and provides that, when it is for three months or less than one year, the mayor may “ commute for a sum less than said $500, but in no case less than $250, for a theatre.”
"Whether exhibiting from the first of May or any later period in any one year, to the first of May in the following year, would subject the manager or proprietor to any penalty beyond $500 in all, it is unnecessary to determine.
The whole object of the act seems to be, to raise a revenue for a particular purpose.. If the revenue is not paid and a license obtained before the business is commenced, it may be recovered by action, and the proprietor or manager may be restrained by injunction, until such license has been duly obtained, and the order of the court granting the injunction, as to the costs of the action, has been complied with. •(§ 4.)
We do not feel at liberty to hold that opening a building for the exhibition of the opera, and the exhibition of the same without a license, is illegal in any such sense, that an article published of the manager as such, cannot be made the basis of an action for a libel on the mere ground of illegality of such business. (Brown and others v. Duncan, 10 Barn. & Cres., 93.)
(Point IX.) The admission of the programme in evidence could not have prejudiced the defendant. It was made a subject of comment in one of the alleged libels, which charged that on the strength of a formal and pompous programme of arrangements, he succeeded in procuring a large and liberal subscription from our citizens to aid the Opera. That article then proceeds to *237 state various matters, alleged to be libelous, most of which are attempted to be justified on the ground of their truth, or of their being privileged communications.
The contents of the programme were not irrelevant matter, and although it may be true, as this point asserts, that if the defendant did not prove his allegations, as to what the plaintiff had done on the strength of this programme, his defense would fail pro tanto, still the programme was not, for that cause, irrelevant matter, and its introduction cordd not possibly, so far as we can see, have prejudiced the defendant.
It was competent for the plaintiff to produce the programme, and thus show what he promised to do, and that his promise had been kept.
{Point X.) The defendant’s counsel put to a witness this question : UQ. What was the effect upon the house, or the filling of the house, of the articles that were published in the Herald, and which are now complained of?”
To this question the plaintiff objected, the Court excluded it, and the defendant excepted.
Their effect was to be determined by the jury as a question of fact, upon evidence other than the mere opinion of witnesses. We know of no principle which admits the mere opinion of a witness as competent evidence upon such a question. The witnesses are to state facts and circumstances, and it is the province of the jury to determine upon the facts which they find established by the evidence, the issues made by the pleadings.
{Point XI.) The defendant’s counsel also put this question to a witness:
“ Q. What was Fry’s manner to his artists ?
“To this question the counsel for the plaintiff objected.
“His Honor the Chief Justice sustained the said objection, and to his decision thereon the counsel for the defendant excepted.
“ Q. How did Fry treat his artists?
“ The Court. Ask whether he saw any ill treatment to any particular individual.
“ Q. I only ask the fact. State any fact to the jury, showing what Fry’s treatment of his artists was ?
“ A. I can say that he did not treat me badly.
“ Q. But as to others ?
*238 “ A. I know that he had some quarrels with Rosi and Pico.”
The question objected to, in connection with the succeeding questions and answers, shows that the Court intended, and must have been understood to have intended, to allow the witness to state any facts or circumstances which would aid a jury in determining what his actual manner and treatment were, and that the decision, excepted to, only excluded the opinions and conclusions of the witness in respect to the subject matter of the inquiry. We think the decision was not erroneous.
. {Point XII.) Dr. Robert Eorbes, who had visited Benedetti professionally, was interrogated by the plaintiff’s counsel thus:
“ Q. Did he complain of being sick, and how did he appear ?
“ The defendant’s counsel objected to the question, on the ground “ that Benedetti should have been first asked about it.” The Court overruled the objection and the defendant excepted.
“ A. He complained of having been sick a day or two, and there was evident proof in his appearance that he had been.
“ Q. What seemed to be his disease ?
“A. Inflammation of the throat, extending to the chest. A severe influenza was the trouble.”
The defendant did not except to the form of any of these questions, nor object that specified parts of any of them were improper. The Chief Justice decided that “ any fact such as that a man is sick, is proper to be proved,” without first having asked such man, who had been previously examined, whether he was sick or not. The defendant excepted to this ruling of the Court.
Whether Benedetti was in fact sick, was a pertinent inquiry. Being so, it was a fact proper to be proved, whether he had been examined to the point or not, and if he had, without regard to what he had testified, in answer to that question.
{Point XIII.) The expression by Dr. Trudeau (in his de bene esse deposition) that “ Madame Pico, as far as I recollect, is a straightforward, honest, honorable woman, who has never sent for me unless she really was sick, and, in my opinion, would not try to deceive any person,” was properly excluded. It was a pertinent and material question, whether she was actually sick. His opinion and estimate of her generally had no bearing on that question.
*239 {Point XIV) When Maretzek was asked whether, at the place named, Truffi aud Benedetti had been guilty of any unbecoming conduct to him, as leader of the orchestra, and what they did ? The counsel for the defendant objected “to the putting this question in these words and the answer thereto,” and excepted to the decision overruling the said objection. That question was not answered. At all events it does not appear to have been; but the testimony given was elicited by other questions, subsequently put, to the form of which no objection was made. The exception, therefore, is left without the support, the existence of ■which its terms imply. As the question, which was objected to on the ground of the words in which it was expressed, was not answered at all, the ground of the objection failed, and that exception need not be further considered.
It may be added, however, that the witness, at the time these questions were put, was under cross-examination. He had spoken of the fact that Benedetti had offered an insult to him, during the performances in question; and had given evidence tending to show a concert between Ery and his friends to put Benedetti down; and the question: “ I want to know if you advised Mr. Fry to send to Europe to get somebody else instead of Benedetti?” we do not feel at liberty to say was outside of the limits of an allowable cross-examination.
The nature and extent of the questions that may, properly, be put to a witness, by way of cross-examination, depend much upon the circumstances of each case, and rest largely in sound judicial discretion. (Lawrence v. Barker, 5 Wend., 301 to 305.)
{Point XV) The objections to La Fata’s testifying, as to what Benedetti said, on the stage in Philadelphia were, as first taken, that the testimony was “incompetent and irrelevant,” and as subsequently stated, “that Benedetti had not been inquired, of as to what he said.”
He had been asked whether he had not stated as La Fata testified he did. The latter ground of objection, therefore, does not in fact exist.
What Benedetti was proved by La Fata to have said, cannot be regarded as irrelevant, when the time and place of saying it are considered, in connection with the inquiry, whether Fry was guilty of harsh and tyrannical conduct towards him and Truffi; *240 these remarks having been made to her, just after she had fainted and been taken from the stage. Whether she fainted and failed to perform her part from physical inability to go through with it, or feigned sickness, was a question litigated before the jury. What was said to her at the timé, and her reply thereto, or her omission to reply, are not irrelevant matters. We do not think these exceptions well taken.
{Point XVI.) There was no error in excluding the evidence offered to be proved by Ulrick. It does not appear that he was one of Pry’s employees during the period of giving the operatic representations in question. If it did, proof of the general fact that Fry would not pay all he owed to the band of which the witness was one, and managed to get several of them in prison, has no obvious connection with the issues in this action. On this point, the case reads thus:
“ Edward Ulrick sworn: Examined by defendant’s counsel:
Q. What is your business? A. A musician. Q. Had you charge of a band or company, in 1847? A. I had. Q. Were you employed in Fry’s company ? A. Yes. Q. Were you one of a band? A. Yes; the Lagonian Band. Q. How many persons did it consist of? A. Twenty-two. Q. You were all employed by Fry? A. Yes. Q. Did he treat you well ? A. Fo, sir. Q. What did he do to you? Objected to by Plaintiff’s counsel.
“Defendant’s, counsel.—I offer to prove that Fry had the services of these men—of this band—for a considerable period, and was in debt to them between $300 and $400, and would not pay them, and that he managed to get several in prison. Question excluded by the Court, and exception taken.” We have thus briefly noticed all the exceptions taken before the testimony was closed, to which our attention was called on the argument of this appeal, or which are covered by the points of the appellant furnished to the Court on the argument, except the' first three which have heretofore been decided adversely to the defendant by this Court at General Term.
It only remains to notice such of the exceptions taken to the charge as made and to requests to charge, as have been argued or called to our attention during the argument. A single exception was taken while the plaintiff’s counsel was summing up, which will be first noticed.
*241 (Point XVII) The case at folio 1449, reads thus: “The testimony was here closed, and the cause was summed up to the jury by the counsel for the defendant, and then by the counsel for the plaintiff, who, amongst other things, said: 1 The Herald by and by began to find that it could not live without doing something to attract public attention; and about the days of Ellen Jewett, it came out as one of the most infamous sheets that ever existed since man was allowed by the Almighty to handle a pen.’
“ The counsel for the defendant objected, as no evidence had been given in relation to this matter.
“ The Court. He is drawing upon his imagination.
“Plaintiff’s counsel. My learned Mend does not discriminate as to what we are at liberty to take notice of. I should like to know if we are bound to prove everything that we talk about ? Then I should be in danger of saying that it is daylight now. I am speaking of the public history of the time, as I would of the Mexican war, or the reign of Victoria; and if it became necessary to talk about it, it would be perfectly ridiculous to prove the reign of James the first. It is a thing received by all mankind, and that portion which comes within range of the fact, I have a right to talk about. I suppose the gentleman knows that I have a right to talk about Bennett still publishing the Herald, without having proved it, or evidence of other papers, such as the Courier and Enquirer or the Evening Post. Now, Bennett comes up; he has got along with his paper; I do not pretend, and I do not ask you to notice a single fact in relation to that paper, otherwise than as a part of the general history of the country; and so far as I know, the Court will agree with me so far as this, that that which constitutes a part of the public history of the country is what you are at liberty to take notice of.
“ The counsel for the defendant. The learned counsel claims as matter of law, that he has a right to refer to articles in the Herald as part of the history of the country. I desire the Court to say that it is not so.
“ The Court. I will say to the jury whatever is proper to be said at the end of the matter.
*242 “ The counsel for the defendant. Ánd I except to the refusal of the Court, now to stop the counsel.”
The concluding paragraph of the charge reads thus: “ Taking all these things into view, if you find for the plaintiff in this matter, you will assess these damages, taking constantly into view the application of this principle, and leaving out of view anything growing out of what has been said as to the character of his newspaper, about which there is no evidence before us any more than that the paper forms the libel, and divesting yourself of all feeling of that kind, then say in the exercise of a sound discretion what damages ought to be assessed.”
We have no doubt it was the right of the defendant to require .that the plaintiff’s counsel should be compelled to abstain from addressing to the jury such remarks as the case states he had made. And if the case had disclosed affirmatively that the Court refused to arrest that course of remark, and that the plaintiff’s counsel continued to pursue it after objection made, and exception taken to the refusal of the Court to interfere, we should feel it our duty to grant a new trial for that cause.
The merits of a cause can only be rightly determined by a fair and unprejudiced consideration'of the evidence, uninfluenced by any extraneous considerations calculated to excite the passions or warp the judgment.
As it is a rule of pleading, that the issue should be on a material, point, so it is an essential rule of evidence that the proof should be material and relevant to the issue.
‘ It is equally indispensable to the orderly course of judicial proceedings, and an impartial administration of the laws, that counsel on either side should not be allowed to lose sight of the evidence and the issues, and indulge in denunciations of a party, based on the assumption of facts not proved, and which therefore should not be permitted to disturb that calm deliberation which it is the duty of jurors to bestow, and which the parties have a right to expect and demand.
In Willis v. Forrest (2 Duer, 310), the judge at the trial refused to permit the defendant’s counsel, in opening his defense to the jury, to state the matters set up in the answer as a defense to the action, and compelled him to desist from stating them, and also refused to allow him to read the answer with a view to *243 inform the jury what issues were formed by the pleadings, holding that such matters could not be proved, as they would neither constitute a defense, nor were admissible in mitigation of damages. An exception was taken to each refusal, although the case as reported does not distinctly show that all the proceedings here stated occurred. The judgment in that case has been affirmed by the Court of Appeals.
The counsel of the defendant in this action excepted to the refusal of the Court to then stop the counsel of the plaintiff. It does not appear that the plaintiff’s counsel subsequently made any remarks, in which he should not have been permitted to indulge. The Court instructed the jury that they should lay out of view anything that had “been said as to the character of defendant’s newspaper, about which there is no evidence, any more than that the paper forms the libel, and to divest themselves of all feelings of that kind, and then say in the exercise of a sound discretion what damages should be assessed.”
It appears affirmatively, therefore, that the jury were instructed that these obnoxious statements should be disregarded, and the defendant must show, when he reposes on an exception, enough to make it distinctly appear that improper allegations were made after he objected to the plaintiff’s counsel being permitted to indulge in remarks of the character to which such objection referred.
A bill of exceptions, in which the testimony is given by question and answer, often shows a question put, an objection to it, that the objection was overruled, and that the decision was excepted to.
Whether the question was or was not answered does not otherwise appear than that no answer to the question is contained in the case, and it does not affirm that the question was answered.
In such a case I do not think a new trial should be granted, although it was error to allow the question to be answered, unless the case shows that it was in fact answered.
{Points XVIII, XIX, XX.) The twenty-fourth request to charge was in substance that the plaintiff does not complain “of any attack upon his private character, or of any publication which relates to him in any other character or capacity than his *244 situation as a manager of the Italian Opera Company, and his qualities and acts as such manager.”
The twenty-fifth was that as such conductor and manager, and while so engaged, “the personal qualities of the plaintiff for that station, his public appearances before his audiences assembled to witness them, and his treatment of, and his official relations to his artists, were all lawful subjects of comments and criticisms ; every individual has a right to form and express, by speech or writing, his opinions in relation to them.”
The twenty-sixth was “ that if the jury shall believe that the remarks made in the Herald, which are complained of, were published in an honest belief of their truth, and for the Iona fide purpose of commenting on the conduct and qualities of the plaintiff as such manager of the opera, their publication by the defendant is excused in the law, whether they be founded in truth, in point of fact, or be just in point of commentary or not; every individual has a right to form and express, by speech or writing, his opinions in relation to them.”
The Court charged, among other things, “that all the parts of these libels which reflect on Mr. Fry’s want of judgment and skill, either in the selection of operas, or the choice of incompetent performers, everything of that kind is open to criticism, and Mr. Bennett is not responsible, if these opinions be not correct; but all those parts of the libels which charge Mr. Fry with unjust, tyrannical and oppressive conduct in reference to his dealings with his artists, do not come within the rule.” For the latter “he is responsible, unless he has succeeded in satisfying you that they are substantially true.” “ The law does not require that every minute particular of the statement should be literally proved to be true; the truth of the libel must be substantially proved; no material part of any kind is to be left unproved. The justification must be as broad as the libel; you will apply that doctrine to this case too. A legal justification amounts to a complete defense, and if the jury find that made out here, it is their duty to find for the defendant.”
This part of the charge covers the matters of the three requests to charge, last referred to. It instructed the jury that such parts of the articles as charged the plaintiff “ with unjust, tyrannical and oppressive conduct in reference to his dealings with his *245 artists,” the defendant must prove to be true, or, as to these, the plaintiff would be entitled to recover.
The Judge also charged that “in any statements of matters of fact,” a “party is responsible for the truth of what he states, but is not responsible for his opinion and judgment.” “ The critic may have an honest opinion of a book, which is unfavorable, and may not be accurate, but he is not responsible for that opinion. Not so with respect to matters of fact. If the critic of a book states a fact contrary to the truth, he is responsible, not for the criticisms which he makes, but for the false basis he has assumed.”
We think the jury must have understood that of any opinion or judgment expressed by the defendant upon any facts they should find established by the evidence, the defendant was not liable, however erroneous the opinion. And they were, in terms, instructed, that for all the parts of the libels which reflected on the plaintiff’s want of judgment and skill, either in the selection of operas or the choice of incompetent performers, and everything of that kind, Mr. Bennett was not responsible, even if his opinions were not correct. That these matters were all open to criticism: the only parts of the libels specified as not being of that character, were those which imputed to the plaintiff “ unjust, tyrannical, and oppressive conduct, in reference to his dealings with his artists.” And their attention, at the commencement of the charge was called to the fact that the libels might be reduced to two classes, those which contained matter which related to the plaintiff’s management of the opera generally, and those which charge him with harsh and unjustifiable conduct in relation to his employees.
The extent to which the defendant was protected, under the charge as given, in the expression of his judgment and opinions, was as great as the law in relation to that subject entitled him.
The parts of the libel, which imputed to the plaintiff the unjust, tyrannical, and oppressive conduct spoken of, could only be justified by proof of their truth. The defendant’s belief of their truth is not a defense to an action for their publication. This Court, when this action was before it, at General Term, on demurrers to the answers, speaking of those portions of the libels, remarked that “ the libels, which are the subjects of com* *246 plaint, do not consist in deductions and inferences from acknowledged facts, but in the assertion of facts, and the imputations of designs and motives, which, unless the defendant, under corrected pleadings, shall prove to be true, he cannot be justified, or .excused for publishing.” (Fry v. Bennett, 5 Sand. S. C. R., 73, 74.)
The charge as given, was in this view correct, and covered the matter of these three requests. (Cooper v. Stone, 24 Wend., 434.)
{Point XXI.) The Judge did charge, in conformity to the 27th request, that if the matters of fact contained in the several articles complained of, were substantially true, the defendant was entitled to a verdict. The twenty-first point, therefore, assumes that the Judge refused to charge what the case shows he did charge.
Points XXII, XXIII, XXXIII, XXXIV, XXXV, XXXVI, XXXVIII and XL^ relate to the rule of damages, and may be considered together.
The true rule is that, if the defendant fails to justify, the plaintiff is entitled to recover, at all events, his actual damages. He has a right to these, although the defendant, at the time of publishing the libels, believed the facts alleged, to be true. The actual damages are to be determined by the jury, in the exercise of a sound discretion, upon a careful consideration of the offense or misconduct imputed to the plaintiff, the circumstances of the publication, the extent of its circulation, and the natural and necessary consequences of such a publication, ’ according to the results of human observation and experience. There is no such rule as that a plaintiff can recover no more than the testimony of witnesses, speaking to the extent of actual damages, enables a jury to say by arithmetical computation, that" the plaintiff has lost. Evidence of that character is not attempted. The Judge said he had “ always held the rule in such cases to be that the jury could look at the whole character of the transactions, and that they could take into consideration all the proof before them of any malicious and actual intent to injure the plaintiff. General malice against the plaintiff may not be proved, but actual malice in making the publications complained of may be proved.”
*247 “If a man by mistake publish a libel, the law would fix malice upon it only so far as to make him responsible, but it would be a different thing if, instead of publishing it by mistake, he did so with a view to injure the plaintiff.”
If the “ defendant stands before us as a man who deliberately undertook to do an injury, and if'he fail to prove his allegations to be true, h,e cannot escape with nominal damages. The whole question of damages is entirely within your sound discretion. If you find for the plaintiff you will assess such damages as the occasion requires.”
We think the Judge did charge the jury in such a manner that they must have understood it to be stated as a rule to guide them, that if the defendant published the articles believing the statements made to be true, or under a mistake as to their truth, that such fact was to be considered in fixing the amount of damages. That is the substance of the proposition asked by the 28th request. We have already expressed the opinion that actual malice, in making the publications in question, was a matter proper to be proved. The defendant was not entitled to the instruction asked in his 29th request. (Point XXIII.)
The part of the charge forming the basis of the 74th exception (Point XXXIII) must have been understood to be an instruction to find a verdict in the aspect of the case as then presented, for what they should find to be the actual damages, ascertaining them by a fair consideration of the elements of damage furnished by the character of the libels and the business of the plaintiff.
The instruction reached by the 75th exception (Point XXXIV) presented an additional element to be considered, if they should find that the libels were published with an actual intent to injure the plaintiff.
The 76th, 77th and 79th exceptions, if the views we have stated are correct, are not well taken. See points XXXV, XXXVI and XXXVIII of the appellant.
The 24th and 25th points have been already considered.
The 26th, 27th, 28th, 29th, 80th, 81st and 32d points, covering the 67th, 68th, 69th, 70th, 71st, 72dand 73d exceptions, are substantially disposed of by the views stated in considering the 18th, 19th and 20th points.
*248 The defendant contended at the trial that all of the publications and the whole matter thereof were privileged. And he asked the court to charge the jury that Fry’s “ treatment of his artists ” was a lawful subject of comment, and if the jury believe the remarks were published in an honest belief of their truth, the publication is excused in law, whether the statements were true or not. The exceptions covered by the points now under consideration, were taken to portions of the charge relating to this branch of the case, and the position taken by the defendant in respect to it.
Ho point was made that the rules as stated by the Judge did not discriminate with sufficient precision and distinctness between what was privileged and what was not, to protect the defendant from misapprehension by the jury. The only part of the matter which the Judge suggested was not privileged, provided it was published in good faith, was that which imputed to the plaintiff “.oppressive and unjustifiable conduct in dealing with his employees,” or as stated in another part of the charge, “unjust, tyrannical and oppressive conduct in reference to his dealing with his artists,” or “harsh and unjustifiable conduct in relation to various individuals whom he had employed, especially the female portion of them.”
We think this part of the case was presented to the jury, as favorably as the defendant had a right to ask.
Points XXXVII, XXXIX and XLI cover exceptions, two of which are in these words, viz.:
“ The counsel for the defendant, also in due time excepted to so much of said charge as represented to the jury the testimony of Strakosch, as authorizing them to find that either of the publications alleged to be libelous was made by the defendant with an actual malicious intent to injure the plaintiff.” (78th exception.)
“ The counsel for the defendant also excepted to so much of the charge as related to Strakosch’s testimony, and the effect of it.” (82d exception.)
With reference to the first of these two exceptions, it is to be observed that no objection was taken to the submission of the question what Mr. Bennett did in fact say. We do not discover that the charge is open to the objection that the Judge expressed any opinion of his own to the jury, as to the effect of his evidence. *249 He told the jury the testimony of this witness must be scrutinized with caution, and pointed out various objections to their reaching the conclusion that the defendant said, “ I will finish Fry,” or “this will finish Fry,” and left it to them to find as a matter of fact what he did say, and his intent, as the facts which they should find proved would establish it. We do not think there is anything in the comments made upon the testimony of that witness, which will support an exception, in the form of either of the two above stated, or which will justify us in holding that the part of the charge covered by the 89th point was erroneous.
The charge does not amount to an unqualified instruction that his testimony would justify them in finding actual malice. The terms of the charge imply that the counsel of the parties did not agree, as to his statements of what Bennett did say. In that state of things, the Chief Justice presented to the jury what each party claimed his testimony to have been, and the inferences claimed to result from each version of his testimony, and also stated what the testimony was, according to the notes of it which he had taken. He left it to the jury to act upon their recollection of what Strakosch had said, and as they should find the words spoken to be, “this will finish,” or “I will finish,” &c.; or it is “finished,” to determine the question of actual malice in making the publication in question.
As the Judge was not so clear and positive in his recollection of the words of the witness that he could state, unhesitatingly, that the witness finally concluded the word. “ finished ” was the one used, he could not properly do otherwise than leave the jury to act upon their recollection, affected as it might be by a statement of what his notes disclosed in respect to that matter.
The case being before us on an appeal from the judgment only, and not from the order denying a motion for a new trial, we can only look at the exceptions taken.
These not entitling the defendant to a new trial, the judgment must be affirmed with costs.*

 After the argument of the foregoing appeal, and while the cause was under consideration, the defendant moved (in April, 1858) to amend his notice of appeal so as to make it an from the order his motion for a new *250 trial, as well as an appeal from the judgment. The motion was denied, and the order denying it was affirmed by the Court, on appeal to the General Term. (16 How. Pr. R., 385, 401; see 2 Bosw., 684.) The defendant served, on the 25th of May, 1858, a notice of appeal from the order denying the motion for a new trial, on the ground that no such service of the order had been made as was required to bar his right to appeal from it. The plaintiff, in June, 1858, made a motion, before the General Term, for an order dismissing such appeal, which motion was denied. (16 How. Pr. R., 402, 406; see 2 Bosw., 684.) The counsel not agreeing to submit such appeal, on the argument made on the appeal from the judgment, to the Judges who heard that appeal, the appeal from the judgment was decided on the 3d of July, 1858.
The appeal from the order denying the motion for a new trial was argued at the October General Term, 1858, before Snossotr, Woodruff and Pierrepont, J. J. On the 11th of December, 1858, while the appeal was under consideration, an order was made allowing the case to be amended so as to show what remarks were made by plaintiff’s counsel "after the exception taken to the Court’s refusal to stop such counsel, and striking the sixth libel from the record. After the case had been thus amended, and on the 18th of June, 1859, the order denying the motion for a new trial was affirmed.