## John B. Palmer *v.* City of Concord.

Publications charging an army with cowardice, or with improper treatment of non-combatants, are *prima facie* libellous; and, unless justified or excused, are punishable by indictment.

Newspaper publications alleging mal-administration of public affairs are not libellous by reason of any *prima facie* defamatory matter therein contained, if the publisher, believing upon reasonable grounds that the facts alleged were true, published them in good faith for the purpose of inducing a reform.

But if the publisher's motive was not a justifiable one, the truth of the facts alleged would not constitute a defence to an indictment for libel.

- Under the statute making cities and towns liable for damages caused by mobs, (Pamphlet Laws, 1854, ch. 1519,) it is no defence to show that the town could not have prevented the destruction of the property, or that none of the rioters were citizens of the town.

Under the statute provision that towns "shall be liable to indemnify the owner" for property destroyed by a mob, a newspaper publisher whose printing materials have been so destroyed is entitled to recover the damage resulting from the interruption or destruction of his business, and for the injury to the good will of his paper, so far as such interruption and injury were the direct and natural results of the attack of the mob.

The destruction of property is "caused" by the owner's illegal or improper conduct within the meaning of the term "caused" as used in Pamphlet Laws, 1854, ch. 1519, if, without such conduct on his part, the destruction would not have occurred.

The statute of 1854, Pamphlet Laws, ch. 1519, provides that no person shall recover damages of a town for the destruction of his property by a mob, if it shall appear that the destruction was caused by his "illegal or improper conduct;" held, by a majority of the court, that "improper conduct" was such as a man of ordinary and reasonable care and prudence under the circumstances, in the owner's situation, would not have been guilty of; and that the town was not liable if the destruction would have been avoided by ordinary care and prudence on the part of the owner.

Under the same statute, held that, although illegality or impropriety is not to be presumed in the absence of proof of any circumstances imputing them to the property-owner, and evidence for the direct and special object of disproving them is not required of the owner in the first instance, yet, where the evidence on these points is conflicting, the burden of proof is on the owner to establish the legality and propriety of his conduct by a preponderance of testimony.

The statute of 1854, Pamphlet Laws, ch. 1519, provides that no property-owner shall recover of the city, "unless he be made to appear that he, upon the knowledge had of the intention or attempt to destroy his property, or to collect a mob for such purpose, and sufficient time intervening, gave notice thereof to the mayor of the city, or a justice of the peace of the city :" *Held,* that the fact that threats or complaints relative to the articles published in plaintiff's newspaper, were communicated to him, or the fact that intimations of danger were given him, was competent to be considered on the question whether the owner shall have given notice.

Proof of the actual effect produced on some persons by reading certain news̱paper articles is competent as bearing on the question whether the publication of the articles was an act of ordinary care and prudence; and also on the question whether the destruction of the owner's property by some of the readers was caused by the publication of the articles.

Case, brought under chap. 1519, Laws of 1854, to recover damages for property destroyed by a mob. The first two sections of the statute are as follows: Section 1. "Be it enacted, &c., That whenever persons unlawfully, riotously and tumultuously assembled, shall injure or destroy any property, real or personal, the city or town within the limits of which such property may be situated, shall be liable to indemnify the

owner thereof for the property so injured or destroyed, to be recovered in an action on the case." "Sec. 2. No person or persons shall be entitled to the benefits of this act, if it shall appear that the destruction of his or their property was caused by his or their illegal or improper conduct, nor unless it be made to appear that he or they, upon the knowledge had of the intention or attempt to destroy his or their property or to collect a mob for such purpose, and sufficient time intervening, gave notice thereof to the mayor of the city, selectmen of the town, or a justice of the peace of the city or town, in which such property may be situated."

The plaintiff was the publisher and printer of a newspaper called the Democratic Standard, at Concord, where he commenced its publication in 1857. His printing materials were destroyed between three and four o'clock, in the afternoon of Aug. 8, 1861, by a mob consisting of privates of the First New Hampshire Regiment Volunteers, and other persons. He claimed to recover for those materials, and for the injury to, or destruction of, the good will of the Standard, and the interruption and destruction of his business.

The principal matters in controversy were, whether he gave to the mayor or a justice of the peace, the notice named in the statute; whether he had the knowledge and the time which would require him to give the notice; whether the destruction of his property was caused by his illegal or improper conduct; and the value of the property destroyed.

The First New Hampshire, a three months' regiment, arrived at Concord, at the expiration of its term of service, Aug. 5th, and some of the officers and men remained there until Aug. 8th. There was evidence tending to show that this regiment had been in Martinsburg, Va. The plaintiff testified that he was in his printing room Aug. 8th, all day, until driven out by the mob; that, in the afternoon and before the riot, a soldier came into the printing room for some copies of the Standard, and that he gave the soldier some copies dated Aug. 3, 1861.

Subject to plaintiff's exception, defendant introduced in evidence a Standard dated Aug. 3, 1861, and read to the jury the following articles therein:

"THE LATE BATTLE—IMPROMPTU.

1st.        It frightened the Federals to see them come,
They wheeled about and away they run,
They *Run* so fast to tell the news,
They left their knapsacks, guns and shoes."

"EPIGRAM.

2d.        To Manassas Junction
The Yankees thought was fun,
But greatly were mistaken,
For they only took the *Run*."

## "CHANGING TUNE.

3d.
> 'Forward to Richmond, let us fly !'
>   The Yankees shout, while blundering on,
> But Davis changed their battle cry
>   To 'Backward, boys, to Washington.' "

4th. "☞ Our Southern papers are filled with heart-sickening accounts of the murders and robberies which individuals in Old Abe's Mob are perpetrating on the Southern people. Innocent women and children are shot on their own door steps, for wearing what is called 'secession bonnets.' No wonder the Northern people run, when the honest men of the South march towards them."

5th. "☞ The Black Republicans are making a great ado over the treatment of our dead and wounded soldiers by the Confederate troops, at the battle of Bull Run. But not one word have they to say about the conduct of *ours* upon men, women and children, in Hampton, Martinsburg, Fairfax, Germantown, and other places in Virginia and Missouri through which they have passed."

Subject to plaintiff's exception, defendant introduced the following testimony :

John B. Palmer, on cross-examination. "About the first of May, 1861, perhaps the first week, George Hutchins, of whom I hired the printing room, came in and said that he had been down to Boston, and the people found a good deal of fault with the Standard, and that I must stop publishing Burke's articles, and copying from Democratic papers, or quit his building. A week afterwards he came in again and told me to clear out of his building. He told me I was liable to be mobbed and murdered on my way home in the night time, and nobody know how. Immediately, and in consequence of this talk, I bought and carried a pistol."

Ephraim Woodward. "Some soldiers came into my store in Concord, with the Democratic Standard, and were very angry and threatened to clean out the paper on account of the articles. I think they had been drinking."

George Hutchins. "In July, 1861, I told plaintiff that there was complaint about his paper, and danger of trouble. He said he had a pistol and axe, and should defend himself."

Lewis L. Mower. "Three or four days before the riot, I warned plaintiff that there was danger from excitement of the soldiers by his paper. He said he didn't care, he should do as he was a mind to, and if they mobbed his paper, he would send to Manchester, and two thousand Democrats would come up and join the Democrats of Concord and clean out every Republican paper in Concord."

Subject to plaintiff's exception, other witnesses testified that they saw soldiers who had copies of the Standard, and were threatening the Standard office on account of the articles published in it reflecting on the soldiers.

The court instructed the jury that, as matter of law, the articles above

quoted were not libellous; that no action, civil or criminal, could be maintained against the plaintiff for publishing those articles with any intent whatever; that plaintiff was guilty of no illegal conduct in writing or publishing any of those articles; that it was immaterial whether the city government, or the police, or the city, could, or ought to, have prevented the destruction of plaintiff's property; that it was immaterial whether any of the rioters were citizens of Concord; that if plaintiff was entitled to recover anything, he should recover for the damage resulting from the interruption or destruction of plaintiff's business, and for the injury to the good will of the paper. To which instructions defendant excepted.

The court also instructed the jury that the destruction of plaintiff's property was caused by his illegal or improper conduct, within the meaning of the word "caused," as used in the statute, if, without such conduct on his part, the destruction would not have occurred; that improper conduct was such as a man of ordinary and reasonable care and prudence, under the circumstances, in plaintiff's situation, would not have been guilty of; that defendant was not liable if the destruction would not have happened but for something said or done by plaintiff, which a man of ordinary prudence, under the circumstances, in his situation, would not have said or done; that defendant was not liable if the destruction would have been avoided by ordinary care and prudence on the part of plaintiff; that if a man of ordinary care and prudence, under the circumstances, in plaintiff's situation, would not have published the articles (above quoted) and if, but for those articles, the destruction would not have happened, the verdict should be for defendant; that the same questions of care and prudence arose upon the evidence relating to plaintiff's giving copies of the paper to soldiers on the day of the riot, brandishing his weapons, defying the crowd, refusing to give up his weapons, and firing his pistols, at the commencement of the riot, and upon all the evidence relating to his conduct; that, upon the question whether the peculiar character of the articles caused the destruction, they should consider the evidence tending to show that soldiers were enraged by reading the articles and threatened plaintiff's office; that, both as to illegal and improper conduct, the evidence, being conflicting, must preponderate in favor of plaintiff, or the verdict be for defendant; and that, upon these points, and upon the question of notice, the burden of proof was on plaintiff; to which instructions plaintiff excepted.

The jury disagreed, and this case was reserved for the determination of the questions herein raised, and which will arise at another trial.

*Lewis W. Clark*, and *Small*, for plaintiff.

*Tappan, Mugridge*, and *Wheeler*, for defendant.

PERLEY, C. J., and BELLOWS, J., did not sit.

SMITH, J. I. A libel, as applicable to individuals, is a malicious publication, tending to injure the reputation of the person libelled, and

expose him to public hatred, contempt, or ridicule. 2 Kent's Com. 16, 17; *Bellows, J.*, in *Smart* v. *Blanchard*, 42 N. H. 137, p. 151. The first of these articles charges the United States forces in Virginia with cowardice, and holds them up as objects of ridicule therefor. The fourth article calls the army a "mob," and, although the charges of murder and robbery may perhaps be considered as limited in their application, the charge of cowardice against the whole army is repeated. The fifth article in effect charges those bodies of soldiers who passed through, or occupied, Hampton, Martinsburg, Fairfax, or Germantown, with improper treatment of persons of all ages and sexes in each of those places. If such charges had been made against a single soldier named in the articles, they would *prima facie* have constituted a libel. The tendency to expose him to contempt or ridicule could not be doubted; and the tendency to injure his professional reputation would be equally apparent. A soldier's character for courage or discipline is as essential to his good standing as a merchant's reputation for honesty, or a physician's reputation as to professional learning or skill, would be in their respective callings. And by military law, to which the soldier is amenable, we suppose cowardice would be regarded as a crime punishable by severe penalties.

As these charges were made against a body of men, without specifying individuals, it may be that no individual soldier could have maintained a private action therefor. But the question whether the publication might not afford ground for a public prosecution is entirely different. Civil suits for libel are maintainable only on the ground that the plaintiff has individually suffered damage. Indictments for libel are sustained principally because the publication of a libel tends to a breach of the peace, and thus to the disturbance of society at large. It is obvious that a libellous attack on a body of men, though no individuals be pointed out, may tend as much, or more, to create public disturbances as an attack on one individual; and a doubt has been suggested whether "the fact of numbers defamed does not add to the enormity of the act;" see 2 Bishop on Criminal Law, 3d ed., sec. 922; Holt on Libel, 246–7; Russell on Crimes, 1st Am. Ed., 305, 332. In *Sumner* v. *Buel*, 12 Johnson 475, where a majority of the court held that a civil action could not be maintained by an officer of a regiment for a publication reflecting on the officers generally, unless there was an averment of special damage, *Thompson, C. J.*, said, p. 478: "The offender, in such case, does not go without punishment. The law has provided a fit and proper remedy, by indictment; and the generality and extent of such libels make them more peculiarly public offences." In *Ryckman* v. *Delavan*, 25 Wend. 186, *Walworth, Chancellor*, who held, in opposition to the majority of the court of errors, that the plaintiff could not maintain a civil suit because the publication reflected upon a class of individuals and not upon the plaintiff personally, said, pp. 195–6: "There are many cases in the books where the writers and publishers of defamatory charges, reflecting upon the conduct of particular classes, or bodies of individuals, have been proceeded against by *indictment or information*, although no particular one was named or designated therein,

to whom the charge had a personal application.    All those cases, however, whether the libel is upon an organized body of men, as a legislature, a court of justice, a church, or a company of soldiers, or upon a particular class of individuals, proceed upon the ground that the charge is a misdemeanor, although it has no particular personal application to the individual of the body or class libelled, because it tends to excite the angry passions of the community, either in favor of or against the body or class in reference to the conduct of which the charge is made, or because it tends to impair the confidence of the people in their government or in the administration of its laws."    In the course of his opinion the Chancellor mentions a Scotch case, (*Shearlock* v. *Beardsworth,* 1 Murray's Rep. of Jury Cases,) where a civil suit was maintained which was "brought by a lieutenant colonel in behalf of his whole regiment for defamation, in calling them a regiment of cowards and blackguards."    In *Rex* v. *Hector Campbell,* King's Bench, Mil. Term, 1808, (cited in Holt on Libel, 249, 250,) an information was granted "for a libel on the college of physicians;" and the respondent was convicted and sentenced.

Cases may be supposed where publications, though of a defamatory nature, have such a wide and general application that in all probability a breach of the peace would not be caused thereby; but it does not seem to us that the present publication belongs to that class.

Our conclusion is that the jury should have been instructed that the first, fourth and fifth articles were *prima facie* libellous, and that the publication of those articles must be regarded as "illegal conduct," unless justified or excused by facts sufficient to constitute a defence to an indictment for libel.

II.    If, at the next trial, the plaintiff attempts to justify or excuse the publication, the general rules of law as to justification or excuse will be found in the opinion of *Parker, C. J.,* in *State* v. *Burnham,* 9 N. H. 34, and need not be fully re-stated at this time.    The special suggestions, we have now to offer on this branch of the case for the guidance of the court at a new trial, are, in the main, applications of the doctrines of *State* v. *Burnham* to some of the facts of this case; and are not intended as a full statement of the law on the subject of justification.

Conductors of the public press have no rights but such as are common to all.    *Sheckell* v. *Jackson,* 10 Cush. 25, pp. 26–7.    But in this country every citizen has the right to call the attention of his fellow citizens to the mal-administration of public affairs or the misconduct of public servants, if his real motive in so doing is to bring about a reform of abuses, or to defeat the re-election or re-appointment of an incompetent officer.    If information given in good faith to a private individual of the misconduct of his servant is "privileged," equally so must be a communication to the voters of a nation concerning the misconduct of those whom they are taxed to support and whose continuance in any service virtually depends on the national voice.    To be effectual, the latter communication must be made in such form as to reach the public.

If the end which Palmer had in view, the controlling, moving purpose of the publication, was to inform the public of the manner in which the war was conducted, for the purpose of inducing citizens to use their influence with government to repress abuses, or to vote for members of Congress and other elective officers who would check such abuses, reform the army, stop the war, or conduct it in a more humane manner, his end or motive was justifiable. If the end to be attained is "to give useful information to the community, or to those who have a right and ought to know, in order that they may act upon such information, the occasion is lawful;" *Parker, C. J.*, in *State* v. *Burnham*, 9 N. H. 34, pp. 41, 42. If such were Palmer's motives he is not guilty of libel if the facts he alleged were true, or if he had probable cause to believe, and did believe, that they were true. But if he had no justifiable motive, inasmuch as the natural and inevitable tendency of the publication is to injure and degrade, he is guilty of libel even though the facts alleged in the articles were true. *State* v. *Burnham*, 9 N. H. 34, p. 41.

In determining Palmer's motive, the jury may consider the alleged libels as pieces of evidence. This is a question of fact to be decided by the jury "upon an examination of the statement itself, as well as of the extrinsic facts and circumstances." *Gilpin* v. *Fowler*, 9 Exch. 615.

In one respect the views expressed upon this branch of the case may seem to be a departure from the doctrine of *Parker, C. J.*, in *State* v. *Burnham*, 9 N. H. 34, p. 42 : "If, upon a lawful occasion for making a publication, he has published the truth and no more, there is no sound principle which can make him liable, even if he was actuated by express malice." It seems to us that in order to settle whether the occasion was lawful we must generally inquire into the motives of the publisher. There may be some cases where the occasion renders not only the motive but the truth of the communication immaterial. Thus it may be the better rule that no relevant statement made by a witness or by counsel in the course of a trial is actionable, even though false and malicious; see *Revis* v. *Smith*, 18 Com. Bench, 126. But in the great majority of instances, and certainly in the present case, the lawfulness of the occasion depends upon the good faith and real purpose of the publisher. Most of what are called "privileged communications" are "conditionally," not "absolutely," privileged. "The question is one of good faith" or motive, and can be settled only by a jury. A court cannot rule that a communication is privileged without assuming the conditions on which it is held to be privileged, namely, that it was made in good faith, for a justifiable purpose, and with a belief, founded on reasonable grounds, of its truth; *Bigelow, J.*, in *Gassett* v. *Gilbert*, 6 Gray 94, p. 98 ; *Cowen, J.*, in *Cooper* v. *Stone*, 24 Wend. 434, p. 442. This question was substantially left to the jury by *Gaselee, J.*, in *Blackburn* v. *Blackburn*, 4 Bing. 395, see pp. 405, 408 ; by *Parke, B.*, in *Blagg* v. *Sturt*, 10 Q. B. 899, p. 904 ; and in *Fairman* v. *Ives*, 5 B. & Ald. 642 ; see, also, *Parke, B.*, in *Wright* v. *Woodgate*, 2 Cr. M. & R. 573, pp. 577–8.

III. The instruction "that it was immaterial whether the city gov-

ernment, or the police, or the city, could, or ought to, have prevented the destruction of plaintiff's property" was correct. The liability imposed by the statute is irrespective of any inability or neglect on the part of the city. *Wolfe* v. *Supervisors of Richmond County*, 11 Abbott's N. Y. Practice Reports, 270. In highway cases towns may defend by showing that the obstruction had existed so short a time that they were not in fault for not removing it before the accident; (see *Palmer* v. *Portsmouth*, 43 N. H. 265;) but to allow an analogous defence in suits like the present would in most instances defeat the object of the statute. Mobs and riots are generally of sudden growth, and the legislature could hardly have intended to make the remedy of the property-owner practically dependent upon the want of secrecy or celerity on the part of the rioters.

IV. The instruction "that it was immaterial whether any of the rioters were citizens of Concord" was correct.

V. The instruction as to damages should be qualified by adding, "so far as such interruption and injury were the direct and natural results of the attack of the mob."

VI. The definition of "caused" was correct; see instructions to jury in *Hooksett* v. *Company*, 44 N. H. 105, pp. 108, 111.

VII. The instructions as to what constitutes "improper conduct," and as to the effect of want of ordinary care, are the same which have just been sustained by a majority of this court in *Chadbourne* v. *Newcastle*, Rockingham, December Term, 1868. That decision, which was concurred in by five members of the court, is adhered to by three out of the four justices who are competent to sit in the present case. I dissented in *Chadbourne* v. *Newcastle*, and I now dissent from this confirmation of that decision.

VIII. The instructions as to the burden of proof in respect to illegal and improper conduct were correct. There is no *a priori* presumption of illegality or impropriety; and where the plaintiff's own evidence does not disclose any circumstances tending to show illegality or impropriety on his part, it is not incumbent on him in the first instance to offer evidence "for the direct and special object of establishing" the legality or propriety of his conduct in order to make out a *prima facie* case and avoid a nonsuit. But where there is any evidence tending to show illegality or impropriety, the burden is on the plaintiff to make out his legality and propriety by a preponderance of evidence. We do not propose to review here the somewhat conflicting cases bearing on this subject. A clear statement of the law may be found in the opinion of *Strong, J.*, in *Button* v. *Hudson River Railroad Company*, 18 N. Y. 248, pp. 252–3.

IX. The fact that threats and complaints were communicated to the

plaintiff, or that intimations of danger were given to him, was competent on the question whether he should have given notice. The objection of remoteness in time is addressed to the discretion of the court at the trial term, and the exercise of that discretion is not subject to revision here; see *Holyoke* v. *Grand Trunk Railway Co.*, Coos, July Term, 1868.

X. Assuming the correctness of the instructions relative to ordinary care, &c., the testimony to show the effect of the articles on the soldiers was admissible on the question of care. The effect actually produced on some individuals would assist the jury in determining the probable and natural effect on the community generally. While the effect of an act may sometimes be such as no one would have foreseen, yet the actual effect may always be weighed as one element of evidence in determining the probable tendency of the act. But the jury should have been told that it was not want of ordinary care in the plaintiff to publish articles which might be expected to inflame drunken (but not sober) people, unless at the time of publication he had reason to believe that the articles would be read by persons who were intoxicated.

This testimony was also competent as bearing on the cause of the destruction of plaintiff's property.

*Case discharged.*